UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ADVANCED TECHNOLOGY            *
CORPORATION, INC.,             *
                               *
            Plaintiff,         *
                               *
     v.                        *        Civil Action No. 12-10171-JLT
                               *
INSTRON, INC., TINIUS OLSEN    *
INTERNATIONAL CO., and         *
MTS SYSTEMS CORPORATION,       *
                               *
            Defendants.        *

MEMORANDUM

February 26, 2013

TAURO, J.

I.      Introduction

        Plaintiff Advanced Technology Corporation ("ATC") developed an innovative technique

for measuring the tensile properties of metallic materials, called Automated Ball Indentation

("ABI").  ATC alleges that its competitors – Defendants Instron Inc. ("Instron"), Tinius Olsen

International Co. ("Tinius Olsen"), and MTS Systems Corporation ("MTS") – conspired to

maintain their dominance in the market for mechanical testing equipment, in violation of § 1 of the

Sherman Act and Mass. Gen. Laws ch. 93A, § 11.  ATC alleges that Defendants did so by using

their positions on national and international standards organizations to discredit ATC's ABI

technique and prevent ATC from obtaining a standard for ABI.  All three defendants moved for

dismissal under Federal Rule of Civil Procedure 12(b)(6).  ATC subsequently filed a motion to

amend its complaint.

1

For the reasons set forth below, MTS's and Tinius Olsen's <u>Motions to Dismiss</u> [#19, #21] are ALLOWED as to all Counts.  Instron's <u>Motion to Dismiss</u> [#23] is ALLOWED as to Counts I and II and DENIED WITHOUT PREJUDICE as to Count III.  Plaintiff ATC's <u>Motion to Amend</u> [#37] is ALLOWED as to Count III against Instron and otherwise DENIED.  This action survives as a claim for commercial disparagement against Instron.

II.   <u>Factual Background</u>[1]

In the late 1980s, Fahmy Haggag developed the ABI technique for testing the tensile properties of metallic materials, such as pipelines and bridges.[2]  In 1989, Haggag patented the equipment that performs ABI and started ATC.[3]  ATC's principal business is manufacturing the Stress-Strain Microprobe System, the only equipment that employs ABI technology.[4]

Defendants also manufacture tensile, impact, and hardness testing equipment.[5]  In fact, they command a 70% share of the United States market for mechanical testing equipment.[6]  Defendants' equipment relies on a conventional, destructive test method, which requires shutting off pipe flow and cutting out a sample of pipe to be tested in a laboratory.[7]

---

[1] The following facts are taken from ATC's <u>Complaint</u> [#4] unless otherwise indicated.

[2] Compl. ¶ 24.  Tensile properties include "yield strength, ultimate strength, stress-strain curve, [and] ductility."  Compl. ¶ 24.  Tensile yield strength is defined as the stress that a material can withstand before permanent deformation.  Compl. ¶ 22.

[3] Compl. ¶ 25.

[4] Compl. ¶¶ 5, 40.

[5] Compl. ¶¶ 9-11.

[6] Compl. ¶ 13.

[7] Compl. ¶¶ 14, 23.

ATC's ABI technique has two advantages over Defendants' method: (1) ABI is non-destructive and allows testing of in-service pipes, and (2) ABI testing is faster.[8]  As a result, ABI threatened Defendants' dominance in the market for mechanical testing equipment.[9]

The heart of ATC's claim is that Defendants participated in a fifteen year conspiracy to prevent ATC from obtaining a standard for ABI from the American Society for Testing and Materials ("ASTM") between 1997 and 2007, and from the International Standards Organization ("ISO") between 2009 and 2011.  Defendants' employees occupied positions on both ASTM and ISO and used these positions to block an ABI standard.[10]  In furtherance of this conspiracy, Defendants attempted to discredit ABI by falsely claiming that ABI was duplicative of Defendants' technologies, including Instrumented Indentation Testing ("IIT").[11]

ATC alleges that the individuals involved in the conspiracy include Edward Tobolski of Instron, Earl Ruth of Tinius Olsen, and Jennifer Hay of MTS.  The complaint also contains allegations regarding Sam Low, of the National Institute of Standards and Technology ("NIST"), and Randy Nanstad, of Oak Ridge National Laboratory.[12]  At a hearing before this court, ATC clarified that it does not allege that Low and Nanstad, both federal employees, participated in this conspiracy.  As a result, their conduct cannot be attributed to the conspiracy.

---

[8] Compl. ¶¶ 14, 25.

[9] Compl. ¶¶ 30-38.

[10] Compl. ¶¶ 41, 44.

[11] Compl. ¶¶ 57, 60-66.

[12] Compl. ¶¶ 49, 71.

A.    Allegations Regarding the ASTM[13]

In 2000, ASTM formed an ABI task group, subcommittee E28.06.14.  Subcommittee

members and visitors routinely met to discuss issues and voting before every formal vote.  Under

ASTM regulations, a single negative vote will stop the progress of any draft standard.[14]

In December 2002, ATC's proposed ABI standard received its first formal ballot in

subcommittee E28.06.14.  Twenty-one members voted for the ABI proposal and three voted

against it.  Tobolski of Instron, Ruth of Tinius Olsen, and Low of NIST cast the negative votes.

Hay of MTS voted negative as a non-voting member.  These individuals provided different

reasons for their negative votes.  Hay explained her vote on the ground that there were several

commercially available alternative technologies, including MTS's own product.  Tobolski

suggested changing all references to ABI to IIT in the proposal.  Ruth voted against the ABI

proposal because it did not include precision values from a round robin study.[15]

In 2003, ATC completed a round robin study for ABI.  Tinius Olsen, MTS, Instron, and

Frontics of Korea did not attend.  After the round robin, Ruth proposed deleting the analytical

procedure and precision statement sections of the study, both of which are required sections.[16]

---

[13] The first chronological allegation related to ASTM is that, "at the March 2 & 3, 1998 meeting of E28.06.11 on IIT Practice at NIST in Gaithersburg, Md., Tobolski, Low, and others devised a plan to disband the ABI Task which they executed during the May 1998 meeting in Atlanta, GA." Compl. ¶ 82.  In light ATC's admission that Low is not part of the conspiracy at issue in the complaint, the significance of this allegation is uncertain.  Instron was the only Defendant allegedly present at this meeting.  It is also unclear whether an ABI task group existed in 1998.  In the complaint, ATC does not discuss the formation of an ABI task group until 2000.

[14] Compl. ¶¶ 47, 57, 81-82, 85.

[15] Compl. ¶¶ 47-52.

[16] Compl. ¶¶ 53-54.

In January 2006, Ruth again voted against the ABI proposal.  His negative vote prevented an ABI standard from moving forward and disbanded the ABI task group.  In doing so, Ruth explained, "In general, I do not think it is appropriate for us to create a standard based on 1 manufacturers [sic] piece of equipment.  I think this work should be abandoned in favor of the more generic work that task group E28.06.11 is doing."[17]

Also in 2006, Tobolski sent Haggag an email stating that he could salvage the ABI proposal if Haggag agreed to some changes.  Tobolski proposed changing the name to IIT, deleting precision values, and replacing the analytical equations with a reference to the vendor's manual.  Haggag refused these proposals because he believed that they would discredit ABI.[18]

Instead, Haggag took his ABI proposal to ASTM subcommittee E10.02 on nuclear structural materials, chaired by Nanstad.  Nanstad, who is not alleged to be part of the conspiracy, delayed voting on ABI until 2007.  He then declined to ballot the ABI proposal when Haggag refused to change references to ABI to Instrumented Ball Indentation.[19]

> B.      Allegations Related to the Publication of a False Statement

In February 2009, Tobolski co-authored an article entitled "Advances in Hardness Testing."  In the article, Tobolski erroneously renamed ABI to "Representative Stress Strain (RSS)."  He then stated that "RSS is part of Instrumented Indentation Testing (IIT) of Frontics of Korea described in the ISO Report TR/29381," a misleading technical report.[20]

---

[17] Compl. ¶¶ 56-57, 69.

[18] Compl. ¶¶ 69-70.

[19] Compl. ¶¶ 71-76.

[20] Compl. ¶¶ 77-79.

C.     Allegations Related to the ISO

After the ABI proposal did not pass in two ASTM subcommittees, ATC turned to the ISO.  At the ISO, every country is represented by an organization.  ASTM subcommittee E28.94 represents the United States in the area of mechanical testing.[21]

In 2006, Tobolski told Haggag that he would help get a standard from the ISO at the 2006 meeting in Seoul, Korea.  Tobolski's efforts resulted in the submission of a proposal to the ISO, but the proposal failed when balloted.[22]

In 2010, Haggag requested that Low, who is not alleged to be part of this conspiracy, submit a new ABI proposal to the ISO.  Without polling voters, Low responded that his subcommittee was not interested in ABI.[23]

Haggag next approached Ruth.  Ruth submitted the ABI proposal for a vote in ASTM subcommittee E28.94, the United States representative at the ISO.  By a two-thirds majority, the subcommittee members voted to submit the ABI proposal to the ISO for an international ballot.[24]

At the ISO, the first two requirements for obtaining a standard are: (1) approval by a majority of member countries, and (2) agreement of five countries to participate in draft development.  At the international ballot, a majority of countries approved the ABI proposal, but only two countries (United States and China) agreed to participate in draft development.[25]

---

[21] Compl. ¶¶ 86-87.

[22] Compl. ¶¶ 88-89.

[23] Compl. ¶ 91.

[24] Compl. ¶ 92.

[25] Compl. ¶¶ 102-103.

After the ABI proposal did not attract the requisite support at the international ballot, Haggag contacted the ISO to request an equipment demonstration in order to show the difference between ABI and IIT and clarify the proper subcommittee for ABI.  The ISO acknowledged that a joint meeting was appropriate to resolve jurisdictional disputes.[26]

Haggag then contacted Ruth to schedule an equipment demonstration.  Instead of scheduling a demonstration, Ruth unilaterally put out two ballot items for a vote in ASTM subcommittee E28.94.  The first ballot item asked whether to continue ABI activity.  The second ballot item asked, if so, whether to schedule an ABI demonstration.  Ruth should not have balloted the first item because the subcommittee had already voted in support of the ABI proposal by a two-thirds majority.[27]

ASTM conducted this ballot from July 27, 2011 to August 26, 2011.  At the conclusion of the vote, Ruth reported the results as: two votes to continue ABI activity, four votes to discontinue ABI activity, and ten abstentions.  Haggag requested the names of the negative voters from ASTM Staff Manager Joe Koury, but ASTM never posted the official results and names of voters, as required.[28]

On September 5, 2011, Haggag reviewed the ballot results on the ASTM website and noticed that MTS had two voting members.  Each producer, however, is only allowed one vote. After Haggag pointed out this error, ASTM changed the voting status of one MTS member to remove the redundancy.  Haggag "suspects" that Instron, Tinius Olsen, and MTS voted to

---

[26] Compl. ¶¶ 104-105.

[27] Compl. ¶¶ 107-108.

[28] Compl. ¶¶ 109-110.

discontinue ABI activity.[29]

D.     Procedural Background

On January 30, 2012, ATC filed its complaint.  Later that same day, ATC filed an amended complaint.  ATC brought three counts against Defendants, including (1) violation of § 1 of the Sherman Act; (2) violation of Mass. Gen. Laws ch. 93A, § 11, and (3) commercial disparagement.  All defendants moved for dismissal under Rule 12(b)(6).  ATC then stipulated to dismissal of ASTM as a defendant and moved to amend its complaint for a second time.

III.   Motion to Dismiss

A.     Legal Standard

To survive a motion to dismiss, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face."[30]  The court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff.[31]  The court need not, however, accept the plaintiff's legal conclusions as true.[32]  The court is also "not bound to accept as true a legal conclusion couched as a factual allegation."[33]  The determination of plausibility is "context-specific," requiring the court to "draw on its judicial experience and common sense."[34]  In Ashcroft v. Iqbal, the Supreme Court explained the plausibility requirement as follows:

---

[29] Compl. ¶¶ 111-113.

[30] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[31] Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

[32] Id.

[33] Id. at 678 (quoting Twombly, 550 U.S. at 555).

[34] Id. at 679.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant acted unlawfully.  Where a complaint plead facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"[35]

B.      Count I: Antitrust Conspiracy Under § 1 of the Sherman Act

In Count I, ATC brings a claim under § 1 of the Sherman Act.  Defendants move to dismiss Count I on several grounds, including the statute of limitations and failure to plead a plausible conspiracy, antitrust injury, and causation.  Because this court finds that ATC failed to plead a plausible conspiracy, this court need not address Defendants' alternative arguments.

Section 1 of the Sherman Act prohibits conspiracies in restraint of trade.[36]  This provision reaches only agreements, not independent decisions.[37]  This is true even if independent decisions "lead to the same anticompetitive result as an actual agreement among market actors."[38]  "The statute 'does not require sellers to compete; it just forbids their agreeing or conspiring not to

---

[35] Id. at 678 (internal citations omitted).  The policy reasons behind this pleading requirement are apparent in the antitrust context.  "[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  Twombly, 550 U.S. at 558 (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).  As a result, "the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome."  DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (emphasis in original).

[36] White v. R.M. Packer Co., 635 F.3d 571, 575 (1st Cir. 2011) (citing 15 U.S.C. § 1).

[37] Id.

[38] Id.

9

compete."[39]  The "crucial question," therefore, is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'"[40] To survive dismissal, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made."[41]

Allegations of parallel behavior among competitors fall short of plausibly suggesting an agreement.[42]  This is because parallel conduct, even conscious parallelism, "could just as well be independent action."[43]  In Twombly, the Supreme Court held parallel conduct insufficient because "it was not only compatible with, but indeed more likely explained by, lawful, unchoreographed free-market behavior."[44]  As a result, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of preceding agreement."[45]  "[W]ithout that further circumstance pointing toward a meeting of the minds, an

---

[39] Id. (quoting In re Text Messaging Antitrust Litig., 630 F.3d 622, 627 (7th Cir. 2010)).

[40] Twombly, 550 U.S. at 553 (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)).

[41] Id. at 556.

[42] Id. at 553-54.

[43] Id. at 557.

[44] Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009) (discussing Twombly). "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence."  Twombly, 550 U.S. at 554 (internal citations omitted).

[45] Twombly, 550 U.S. at 557.

account of a defendant's commercial efforts stays in neutral territory."[46]

Several circuits require plaintiffs relying on parallel conduct to plead "plus factors" – that is, circumstances suggesting an agreement rather than mere independent conduct.[47]  While there is no exhaustive list of plus factors, commonly cited factors include: "(1) evidence that the defendant had a motive to enter into a [ ] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[48]

Defendants argue that ATC's complaint suffers from the same deficiencies as the complaint in Twombly.  In particular, Defendants argue that ATC relies on parallel conduct and conclusory allegations of an agreement at some unidentified point, without any further allegations plausibly suggesting collusion.  ATC responds that its complaint is distinguishable from the complaint in Twombly because ATC (1) sets forth factual details absent from the Twombly complaint, (2) pleads a market conducive to collusion, and (3) pleads informal meetings between Defendants that provided an opportunity to conspire.

As described in more detail below, this court finds that ATC's factual allegations, taken as a whole, do not plausibly suggest an unlawful agreement between Defendants.  The crux of

---

[46] Id. at 557.  In Twombly, the Supreme Court drew a line between the "factually neutral" and the "factually suggestive."  Id. at 557 n.5.  The Court concluded that a complaint must plead factual allegations "plausibly suggesting (not merely consistent with) agreement."  Id. at 557.

[47] See, e.g., Burtch v. Milberg Factors, Inc., 662 F.3d 212, 227 (3d Cir. 2011); In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009).

[48] Burtch, 662 F.3d at 227 (quoting In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 321-22 (3d Cir. 2010)).  Several courts have cautioned that certain "plus factors" are not necessarily indicative of collusion.  According to the First Circuit, "many so-called plus factors simply 'demonstrate that a given market is chronically non-competitive,' without helping to explain whether agreement or conscious parallelism is the cause."  White v. R.M. Packer Co., 635 F.3d 571, 580-81 (1st Cir. 2011) (citations omitted); see Burtch, 662 F.3d at 227.

11

ATC's antitrust claim is simply that competitors in a market declined to support a standard that would promote another competitor's technology.  Defendants' resistance to an ABI standard is "not only consistent with, but indeed more likely explained by unchoreographed free-market behavior."[49]  Shorn of its conclusory allegations, ATC's complaint merely describes Defendants' parallel conduct and routine participation in standard setting organizations.[50]  ATC fails to plead additional facts to nudge its conspiracy claim over the line from possible to plausible.

i.     Conclusory Allegations

ATC's complaint contains a number of legal conclusions, including allegations that Defendants "conspired," "agreed," and "colluded."  While these allegations can provide a framework for the complaint, they are not entitled to an assumption of truth.[51]  As a result, these allegations do not bring ATC's conspiracy claim any closer to plausibility.

ii.     Parallel Conduct

ATC pleads that Defendants engaged in parallel conduct, including (1) voting against the proposed ABI standard, and (2) making statements to discredit ABI and make ABI appear duplicative of Defendants' technologies.  Yet, ATC also alleges that each defendant, as a

---

[49] Iqbal, 556 U.S. at 680.

[50] Defendants' mere participation in standard-setting bodies does not give rise to an inference of conspiracy.  See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 396 (7th Cir. 1993) ("[T]he failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1." (citation omitted)); Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 293-94 (5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy,' its every denial of some benefit amounting to an unreasonable restraint of trade.").

[51] Iqbal, 556 U.S. at 679-80 ("[P]laintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth." (quoting Twombly, 550 U.S. at 555)); In re Travel Agent, 583 F.3d at 905 (An allegation of "agreement" is "nothing more than a legal conclusion 'masquerading' as a factual allegation." (citation omitted)).

competitor in the market for mechanical testing equipment, had its own economic incentive to

independently oppose ABI and promote its own products.  Nothing in the complaint indicates that

opposition to ABI "was anything more than the natural, unilateral reaction of each [defendant]

intent on keeping its [ ] dominance."[52]  "[T]here is no reason to infer that the companies had

agreed among themselves to do what was only natural anyway."[53]  Accordingly, ATC's

allegations of parallel conduct do not plausibly suggest collusion, but instead remain in "neutral

territory."[54]

        iii.   <u>Motive to Conspire</u>

Although ATC alleges that each defendant had an economic motive to oppose an ABI

standard, ATC fails to allege that Defendants had a motive to conspire in doing so.  Significantly,

ATC alleges that a single negative vote could prevent a proposed standard from moving

forward.[55]  According to the complaint, this is precisely what happened in 2006 when the single

vote of Ruth blocked the proposed ABI standard and disbanded the ABI task group.  Defendants

---

[52] <u>Twombly</u>, 550 U.S. at 566.

[53] <u>Id.</u>

[54] <u>Id.</u> at 557.  In <u>Twombly</u>, the Supreme Court noted that certain types of anomalous parallel conduct might be suggestive of collusion, such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  <u>Id.</u> at 557 n.4.  That is not the type of behavior alleged here.  ATC alleges that Defendants voted against ABI in 2002 and that Haggag "suspects" that they voted against ABI in 2011.  ATC also alleges that Defendants made various statements regarding ABI at different times over the course of fifteen years.  This conduct is sporadic, not simultaneous, explicable by individual self-interest and legitimate business reasons, and generally ordinary standard setting behavior.  This is not the type of anomalous or otherwise inherently suspicious conduct described by the Court in footnote four of <u>Twombly</u>.

[55] Compl. ¶ 57.

had no apparent need to conspire to block an ABI standard when they could effectively accomplish this objective on their own.[56]

      iv.    Conduct Against Interest

In the context of an antitrust conspiracy claim, an allegation that defendants engaged in conduct inconsistent with their own self-interests may suggest collusion.[57] Here, ATC does not allege that Defendants engaged in any conduct against their own self-interests. All of the conduct alleged, including the allegations of parallel conduct discussed above, is fully consistent with Defendants' individual stakes in the mechanical testing equipment market.

      v.    Procedural Irregularities

In its complaint, ATC refers to two procedural irregularities regarding voting at ASTM. These allegations, however, do not plausibly suggest collusion between Defendants.[58] First, ATC alleges that after ABI failed to attract support from five member countries for draft development at the ISO, Ruth "unilaterally" put out a ballot item for a vote that asked whether to continue ABI activity. According to ATC, Ruth should not have balloted this item because the United States

---

[56] See Trueposition, Inc. v. LM Ericsson Tel. Co., 844 F. Supp. 2d 571, 596 (E.D. Pa. 2012).

[57] See Burch v. Milberg Factors, Inc., 662 F.3d 212, 229 (3d Cir. 2011); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 322 n.20 (3d Cir. 2010) ("'[I]n actual practice, most courts rely on the *absence* of motivation or offense to self-interest to preclude a conspiracy inference' from ambiguous evidence of mere parallelism." (citations omitted)); In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 909 (6th Cir. 2009) ("[W]e note that the plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest in making the cuts." (citation omitted)).

[58] See Trueposition, 844 F. Supp. 2d at 598; (finding that in the context of the complaint, procedural irregularities at a standards organization were not suggestive of an illegal agreement); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 801 F. Supp. 2d 1163, 1196-97 (D.N.M. 2011) (same).

delegation to the ISO had already approved the ABI proposal by a two-thirds majority.  This allegation does not suggest an agreement between Defendants because ATC admits that Ruth acted "unilaterally."[59]  ATC alleges nothing to suggest that Ruth's decision to poll subcommittee members resulted from collusion, rather than independent decision-making.

Second, ATC alleges that at the 2011 ballot, ASTM improperly counted two MTS votes and that after Haggag pointed out this error, ASTM corrected MTS's double voting status.  ATC further alleges that Haggag "suspects" that MTS voted against ABI at the 2011 ballot. Yet, ATC does not allege facts to support an inference that MTS's initial double vote was the result of collusion, rather than a mere technical error.  By the time of the 2011 ballot, MTS no longer owned Nano Indentation, its division that competed with ATC's ABI equipment.[60]  ATC does not explain why MTS had any motive to conspire or to even oppose ABI after the 2008 sale of Nano Indentation.  Additionally, ATC does not allege that Tinius Olsen or Instron (the other alleged conspirators) played any role in improperly granting MTS two votes.  In this context, the fact that ASTM initially counted two MTS votes does not suggest collusion between Defendants.

    vi.   <u>Details of the Conspiracy</u>

ATC argues that its complaint is distinguishable from the complaint in <u>Twombly</u> because it contains more detailed factual allegations regarding the conspiracy.  Although a complaint generally need not set forth detailed factual allegations,[61] the Supreme Court in <u>Twombly</u> noted that the plaintiff "mentioned no specific time, place, or person involved in the conspiracies" and

---

[59] Compl. ¶ 107.

[60] Compl. ¶ 11.

[61] <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

"furnished no clue" as to which defendants "supposedly agreed, or when and where the illicit

agreement took place."[62]  ATC's attempt to distinguish its complaint on this ground is unavailing

because ATC similarly fails to allege any particular conspiratorial meeting between Defendants.[63]

The only specifically alleged meeting is a meeting in 1998 in Maryland between Tobolski,

Low, and unspecified "others."[64]  ATC does not allege that Tinius Olsen or MTS had any

employees in attendance.  Because Instron is the only alleged conspirator present at this meeting,

this allegation does not plausibly suggest a meeting of the minds between Defendants.

vii.   Description of the Market

ATC argues that it has pleaded a market conducive to collusion.  In its complaint, ATC

alleges that Defendants command a 70% share of the United States market for mechanical testing

equipment and that the market has high barriers to entry.  These statements "are simply

descriptions of the market, not allegations of anything that the defendants did."[65]  They indicate

only that the market was an oligopoly.[66]  ATC does not explain why the fact that the market was

---

[62] Id. at 565 n.10.

[63] Compare Burtch v. Milberg Factors, Inc., 662 F.3d 212, 225-26 (3d Cir. 2011), and In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 910-11 (6th Cir. 2009), with Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 186-89 (2d Cir. 2012), In re Delta/Airtran Baggage Fee Antitrust Litig., 733 F. Supp. 2d 1348, 1360-62 (N.D. Ga. 2010), and In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 33-34 (D.D.C. 2008).

[64] Compl. ¶ 82.  As previously stated, ATC admitted that Low was not part of the conspiracy alleged in its complaint.

[65] Erie Cnty., Ohio v. Morton Salt, Inc., 702 F.3d 860, 870 (6th Cir. 2012).

[66] "An oligopoly market is one in which a few relatively large sellers account for the bulk of the output." White v. R.M. Packer Co., 635 F.3d 571, 576 n.4 (1st Cir. 2011) (quoting 2B Areeda, Hovenkamp, & Solow, Antitrust Law ¶ 404a, at 9 (3d ed. 2007)).

an oligopoly makes reasonable an inference that Defendants conspired to stack their votes at a standards organization.  In the context of ATC's complaint, these descriptions of the market are not sufficiently suggestive of any actual collusion between Defendants.

viii.   <u>Informal Meetings and Opportunity to Conspire</u>

Finally, ATC argues that Defendants' regular, off-the-record meetings demonstrate a plausible conspiracy.  In its complaint, ATC alleges that ASTM committee members and visitors routinely met before voting in order to discuss issues and voting.  At most, this allegation indicates an opportunity to conspire, not that Defendants actually did so.

A mere opportunity to conspire, even in the context of parallel conduct, does not plausibly suggest collusion.[67]  Courts that have found an opportunity significant have done so in the context of allegations of particular meetings or conversations, including the dates of meetings and names of the participants, closely on the heels of unprecedented or anomalous parallel conduct.[68]  That is not the situation here.

ATC's description of these meetings further suggests that they were not conspiratorial in nature.  First, ATC does not allege that these meeting were carried out in a furtive manner.  Rather, ATC alleges that non-conspirators, including other committee members and visitors,

---

[67] <u>See</u> <u>Burtch</u>, 662 F.3d at 228; <u>In re Travel Agent</u>, 583 F.3d at 905.  In a world of email, telephones, trade associations, etc., a mere opportunity to conspire says very little. 6 Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 1417, at 115-17 (3d ed. 2010).  Seemingly, any market participant has the opportunity to conspire at any given moment.

[68] <u>See</u> <u>Anderson News</u>, 680 F.3d at 188-89; <u>In re Delta/Airtran</u>, 733 F. Supp. 2d at 1360-62; <u>In re Rail Freight</u>, 587 F. Supp. 2d at 33; <u>see also</u> Areeda & Hovenkamp, <u>supra</u> note 67, at 118 ("In <u>Twombly</u> . . . a conceded 'opportunity' to conspire was completely insufficient absent additional allegations about when and where such an opportunity occurred, and which of the defendants' employees participated.").

attended.[69]  Second, ATC alleges that committee members held these meetings as a matter of routine to discuss issues and proposals.  ATC does not allege that Defendants engaged in any suspicious or anomalous behavior in relation to ABI at these meetings.  In the context of a standards organization, ATC's allegation of routine informal meetings suggests nothing more than business as usual.[70]

ix.     Conspiracy Allegations Taken as a Whole

ATC's complaint is lengthy and contains numerous allegations.  These allegations, however, do not add up to a plausible conspiracy.  ATC alleges (1) conduct by individuals not alleged to be part of the conspiracy, such as Low and Nandstad; (2) conclusory statements of agreement; (3) parallel conduct; (4) an oligopoly; and (5) ordinary standard setting activity, such as routine informal meetings.  ATC fails to allege circumstantial evidence that plausibly suggests a meeting of the minds between Defendants.  As a result, ATC's complaint fails to state a claim under § 1 of the Sherman Act.

C.     Count II: Mass. Gen. Laws ch. 93A

In Count II, ATC brings a claim under Mass. Gen. Laws ch. 93A, § 11.[71]  ATC alleges

---

[69] Compl. ¶ 81.

[70] ATC also alleges that "[b]ecause issues were always discussed outside of formal committee before a formal vote, it is reasonable to assume the conspirators met to collude on their votes before every action taken against ATC and the ABI technique."  Compl. ¶ 85.  At the motion to dismiss stage, the court may draw reasonable inferences from the facts.  ATC, however, fails to allege facts that make this inference of collusion reasonable.

[71] Although ATC does not specify which section of Chapter 93A under which it is proceeding, section eleven applies here because ATC is a business, not a consumer, and ATC has not alleged that it sent a demand letter as required by section nine.  See Shawmut Cmty. Bank v. Zagami, 586 N.E.2d 962, 966 (Mass. 1992).

that Defendants' "efforts to prevent the promulgation of an ABI standard constitute unfair methods of competition and unfair or deceptive trade practices."[72]  ATC's Chapter 93A claim appears to rest on the same conduct that underlies its Count I antitrust conspiracy claim.[73]  As a result, Count II fails for the same reason that Count I fails.[74]  As discussed above, ATC fails to allege a plausible antitrust conspiracy between Defendants and ATC has not offered any unique arguments or allegations regarding its Chapter 93A claim.[75]  Accordingly, Count II is dismissed.

D.     Count III: Commercial Disparagement

In Count III, ATC brings a claim against all Defendants for commercial disparagement. ATC alleges that "Defendants have made a series of false statements or implied false statements regarding the ABI technique."[76] ATC, however, fails to allege any particular false statements by MTS and Tinius Olsen.[77]  As a result, dismissal of Count III is warranted as to these defendants.

---

[72] Compl. ¶ 127.

[73]  Compl. ¶¶ 125-129; Pl.'s Opp'ns Mot. Dismiss 13 [#28], 15 [#29], 13 [#30] ("[T]he cause of action arises in the context of an antitrust complaint . . .").

[74] See Mass. Gen. Laws ch. 93A, § 11 ("In any action brought under this section . . . the court shall be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act."); Mass. Gen. Laws ch. 93, § 1 ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable."); see also Ciardi v. F. Hoffman-La Roche, Ltd., 762 N.E.2d 303, 311 (Mass. 2002).

[75] See RSA Media, Inc. v. AK Media Group, Inc., 260 F.3d 10, 16 (1st Cir. 2001); Evergreen Partnering Group, Inc. v. Pactiv Corp., 865 F. Supp. 2d 133, 143 (D. Mass. 2012); Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc., 126 F. Supp. 2d 40, 50 (D. Mass. 2001); Egan v. Athol Mem'l Hosp., 971 F. Supp. 37, 46-47 (D. Mass. 1997), aff'd, 134 F.3d 361 (1st Cir. 1998).

[76] Compl. ¶ 131.

[77] See Restatement (Second) of Torts § 623A (1977) (requiring a false statement).

As to Instron, ATC pleads a plausible false statement by Tobolski in his 2009 magazine article.  Although unclear, the complaint appears to allege that Tobolski falsely conflated ABI with IIT and erroneously led readers to believe that ABI was part of ISO Report TR/29381, a misleading technical report.[78]  This court cannot resolve Instron's motion to dismiss this count without first determining whether Massachusetts or Tennessee law applies.  The parties have not briefed this topic.  Accordingly, this court denies Instron's motion to dismiss Count III without prejudice and orders Instron and ATC to submit supplemental briefs on this topic.  Instron may renew its motion to dismiss Count III after the briefing deadline.

IV.   Motion to Amend

ATC moves to amend its current complaint to add several new allegations, all of which are described in ATC's motion.  Defendants oppose ATC's motion on the ground that amendment would be futile.  Defendants argue that ATC's new allegations fail to cure the deficiencies present in ATC's current complaint.

A.   Legal Standard

A court may deny leave to amend a complaint where amendment would be futile.[79]  Amendment would be futile if the proposed amended complaint fails to state a claim upon which relief could be granted.[80]  "In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion."[81]  Accordingly, this court reviews

---

[78] Compl. ¶¶ 60-62, 77-79.

[79] See Foman v. Davis, 371 U.S. 178, 182 (1962).

[80] Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).

[81] Id. (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-81 (2d ed. 1993)).

ATC's new allegations in order to determine whether the proposed second amended complaint

(SAC) plausibly states claims for relief.

B.      Counts I & II: Conspiracy Claims

The SAC, taken as a whole, fails to plausibly suggest an unlawful agreement between

Defendants.  Because ATC's new allegations do not nudge ATC's conspiracy claim over the line

from possible to plausible, amendment is denied as to Counts I and II as futile.[82]

First, ATC seeks to add more details regarding the oligopoly in the market for mechanical

testing equipment.[83]  For the reasons stated above, ATC's descriptions of the market are

insufficient to suggest an actual agreement between Defendants to stack their votes against ABI.

Second, ATC seeks to add details of an email sent by Tobolski to four ASTM E28 and

E10 committee members, including Ruth.  This email, however, read as a whole, is not suggestive

of any conspiracy between Defendants.[84]  The fact that Tobolski sent the email to three non-

conspirators (including other committee members) undermines ATC's claim that this is a

conspiratorial communication.  Tobloski's statement in the email that he thinks ABI is the same as

---

[82] ATC proposes eleven new allegations, only a few of which pertain to Counts I and II. This court analyzes only the new allegations that are relevant to the plausibility of ATC's conspiracy claim.

[83] Pl.'s Mot. Am. 2 [#37]; Pl.'s Proposed SAC ¶¶ 11-13 [#37-1].

[84] This court considers the entirety of the email attached as Exhibit B to ATC's Oppositions [## 28, 29, 30] because ATC sufficiently refers to the email in its proposed complaint and the parties have not disputed the authenticity of the email.  See Bedall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)); see also Alt. Energy Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).

IIT is entirely consistent with independent expression and individual self-interest, rather than collusion.  Additionally, in the email, Toboski states, "I personally think that the [ABI] standard should be written because there is a need by the industry to have such a test. . . . I would be happy to take the method into my task group, E26.06.11."  This statement is simply not supportive of ATC's conspiracy claims.

Finally, ATC seeks to add the allegation that "[w]hen a negative vote is cast against a draft standard, it is common practice of the ASTM committees to overcome the objection through discussion and consensus-building."[85]  ATC argues that this common practice suggests a motive for Defendants to conspire to block an ABI standard.  This allegation, however, does not negate ATC's allegation that a single negative vote prevents a standard from moving forward.  Each defendant could individually block an ABI standard by resisting consensus building and persistently opposing ABI, as Ruth successfully did in 2006.[86]  As a result, Defendants did not need to conspire to defeat the ABI proposal.  ATC's new allegation does not suffice to make ATC's claims plausible.

C.    Count III: Commercial Disparagement

ATC seeks to add the allegation that Hay's statement in 2002, described in paragraph fifty-one of the current complaint, is false.  This allegation does not revive ATC's commercial disparagement claim against MTS because Hay's statement is outside the statute of limitations.[87]

---

[85]  Pl.'s Mot. Am. 2 [#37]; Pl.'s Proposed SAC ¶ 56 [#37-1].

[86] Compl. ¶¶ 56-57, 69 ("By voting against the draft standard, Ruth stopped the ABI Standard Test method in its tracks.").

[87]  This court need not decide whether Massachusetts, Minnesota, or Tennessee law applies to ATC's commercial disparagement claim against MTS.  This claim is time-barred in all

The proposed SAC does not allege any false statements by MTS or Tinius Olsen within the limitations period.  As a result, leave to amend Count III as to these defendants would be futile.  ATC may amend Count III as to Instron, subject to Instron's renewed motion to dismiss after the supplemental briefing deadline.

V.   Conclusion

For the above-stated reasons, MTS's and Tinius Olsen's Motions to Dismiss [#19, #21] are ALLOWED as to all Counts.  Instron's Motion to Dismiss [#23] is ALLOWED as to Counts I and II and DENIED WITHOUT PREJUDICE as to Count III.  Plaintiff ATC's Motion to Amend [#37] is ALLOWED as to Count III against Instron and otherwise DENIED.  This action survives as a claim for commercial disparagement against Instron.


AN ORDER HAS ISSUED.


        /s/ Joseph L. Tauro
        United States District Judge

--------

of these states.  See Mass. Gen. Laws ch. 260, § 2A; Minn. Stat. § 541.07; Tenn. Code Ann. §§ 28-3-103, 28-3-104, 28-3-105.