UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADVANCED TECHNOLOGY CORPORATION, INC.<br>　　　　Plaintiff<br>v.<br><br>INSTRON, INC., TINIUS OLSEN INTERNATIONAL CO.,<br>MTS SYSTEMS CORPORATION,<br>and ASTM INTERNATIONAL<br>　　　　Defendants. | CIVIL ACTION 12-CV-10171-JLT |

**PLAINTIFF ADVANCED TECHNOLOGY CORPORATION, INC.'S MEMORANDUM ON CHOICE OF LAW FOR COMMERCIAL DISPARAGEMENT CLAIM**

In 2009, Defendant Instron, Inc. published an article in *AM&P* magazine that contained false statements about the key technology developed by Plaintiff Advanced Technology Corporation, Inc. ("ATC"). That article and other Instron statements – read by ATC's customers and potential customers – gave rise to the commercial disparagement and defamation claims now before this court. These actions originated in Massachusetts but affected the Tennessee plaintiff nationally and globally. Consequently, the laws of either Massachusetts or Tennessee are implicated, and the outcome of this case will depend on which state's law is applied.

In its February 26, 2013 Opinion, this Court requested that the parties brief the issue of choice of law. Doc. No. 48. In response, this memorandum analyzes the choice of law issues and concludes that the factors determining appropriate choice of law weigh heavily toward application of Massachusetts law.

1

## I.     FACTS

Plaintiff ATC is an Oak Ridge, Tennessee company founded in 1988 by Fahmy Haggag. SAC ¶ 5. ATC's main technology, Automated Ball Indentation ("ABI"), is a technique invented and patented by Haggag in 1989. *Id.* at ¶ 7. Since 1997, ATC has attempted to obtain an industry standard for this technique but has been stymied in that effort by Instron and other competitors. *Id.* at ¶ 11.

Defendant Instron is a materials testing company headquartered in Norwood, Massachusetts. *Id.* at ¶ 6. For most of its lifespan, it has offered tensile and hardness testing equipment and services. *Id.*

Ed Tobolski was vice president of materials hardness testing at Wilson Instruments, an Instron Company located at the Company's headquarters in Norwood, Mass. *Id.* As a committee chairman for the E28 committee of ASTM International ("ASTM"), Tobolski has been familiar with ATC, Haggag and the ABI technique since the mid 1990s. *Id.* Tobolski was aware of Haggag's patent (U.S. 4,852,397, 1989) which includes the novel partial-unloading technique since the first ASTM ABI Task Group (E28.90.02) that was commissioned in November 1997. *Id.* at ¶ 29. It is the usual and customary practice under ASTM and ISO to name test methods after the inventor or by the name established in literature. *Id.* at ¶ 34. Tobolski has participated in numerous standards named after their inventors (Brinnell, Rockwell, Vickers, etc.). *Id*. The ABI name was assigned by the inventor Haggag and established in numerous ASTM publications since 1990 (ASTM STP 1092). *Id.*

It is important to note that the ABI technique and the IIT technique (ASTM IIT Practice E2546-07 and ISO IIT Test Method ISO 14577) are two distinct techniques using different

equipment, procedures, analyses, and produce different results, and are not interchangeable. *Id.* ¶ 27, 28.

Yet Instron has persisted in a campaign to conflate the two techniques. Far from helping ATC or ABI, Instron's actions has continually disparaged and damaged the ABI test method and its partial-unloading technique and ATC commercially by equating it with IIT. In doing so, Instron has denied ABI's novelty and proper function.

For example, Tobolski disparaged the ABI technique in a 2006 email[1] sent to Earl Ruth (ASTM E28 Committee Chair), Roger Stoller (E10 Committee Chair), and others. *Id.* at ¶ 33. Tobolski stated, "I've maintained all along that the technology used by Mr. Haggag [ABI] is the same as the Instrumented Indentation Testing [IIT] practice that my task group, E28.06.11, has just balloted." (Ex.A SAC)  He also stated that the E28 actions would "force Mr. Haggag to make most of the changes that some of us want [re-naming ABI to IIT]." *Id.*

Although Instron's effort to get an ISO Standard for IIT failed when balloted internationally, Tobolski (working on behalf of Instron) was successful in co-authoring an ISO Technical Report that was published in 2008 as ISO/TR 29381, titled "Measurement of mechanical properties by Instrumented Indentation Test [IIT] – Indentation tensile properties." *Id.* at 37.  The report includes text and diagrams that describe Haggag's partial-unloading technique – but makes no reference to Haggag as the originator. *Id.* at 39.  Page vii of the report, however, relates the partial unloading technique to an IIT/nano 1993 publication - four years after Haggag's patent of 1989. *Id.* Tobolski is also a member of an ISO ad-hoc Working Group that reviewed the report in 2011 and 2012, retained the IIT/ABI confusion, and failed to reference Haggag, the original inventor of the partial-unloading technique (Ex. B, Ex. E SAC).

---

[1] Discovered in 2012 by ATC through a request through the U.S. Freedom of Information Act, 5 U.S.C. § 552.

In 2009, Tobolski and another Instron employee, Bill O'Neill, co-authored an article in *AM&P* magazine that purported to serve as an overview of existing hardness technologies. (Ex. C) Tobolski announced the ISO/TR 29381 report in the article to promote IIT and damage ABI. "The article summarizes automatic traversing and image analysis, as well as <u>instrumented indentation testing</u>…". *Id*. at 29 (emphasis added).  In fact, however, the article goes on to describe the ABI test method and its partial-unloading technique, except that Instron again labeled this method as another technique, IIT. *Id*. at 31.

Instron's campaign of confusion had its intended effect and caused extensive damage to ATC's business.  For instance in 2008, Chevron Pipeline Company stated in a document that two companies perform ABI testing, and required the testing be run according to the "ISO Standard TR 29381." SAC ¶ 46. ATC replied that it was the only company that performed ABI testing, and it was vastly different from the IIT technique described in that report. Moreover, ATC explained that the report was not an ISO standard. *Id.*

 In 2009, Vectren Energy, an Indiana company, requested a quotation for ABI testing on 317 miles of undocumented pipeline worth approximately $5,000,000.  *Id*. at ¶ 45. In an email to ATC, however, Vectren engineer John Cline said Vectren would discontinue the work because of the ISO TR 29381. He confused IIT with ABI and thought the TR 29831 was an ISO standard. *Id*.

In 2013, Pacific Gas & Electric Co., a California company and ATC customer for two years, bought IIT equipment that it believed was similar to ATC's ABI test equipment.  *Id*. at ¶ 47. As a result, ATC lost more than $1,000,000 in expected revenue in 2013.  *Id*. ATC believes many other companies have been similarly deceived by the Instron's actions.  *Id*.

II. **ANALYSIS**

> A. <u>The Multi-state Nature and Differing State Laws of This Case Give Rise to Conflict of Laws Issues</u>

In deciding what state laws to apply, a trial court hearing a diversity case such as this must follow the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). In Massachusetts, a choice of law issue arises when the issues in the case are linked to more than one state and the state's law that is chosen will affect the outcome of the case. *Pevoski v. Pevoski*, 371 Mass. 358, 359 (Mass. 1974).

Here, the multistate nature of this case is obvious. The article at issue and other activities described in the Second Amended Complaint originated at Instron's Massachusetts headquarters. These actions affected ATC's business and prospective business nationally and globally. It caused harm to ATC at its sole office in Tennessee.

Moreover, the outcome of this case will be affected by the state's law that is chosen. In Massachusetts, the law on commercial disparagement is black letter law, defined as a false statement intended to call into question the quality of a competitor's goods or services in order to inflict pecuniary harm. *Picker Int'l Inc. v. Leavitt*, 865 F. Supp. 951, 964 (D.Mass. 1994), *citing* RESTATEMENT (SECOND) OF TORTS, § 623A (1979). Special damages are to be required at trial, but are not necessarily required as an element of the claim. *FloTech, Inc. v. E.I. duPont de Nemours Co.*, 627 F. Supp. 358, 365 (D.Mass. 1985).

By contrast, the law on commercial disparagement is more tenuous in Tennessee. Although courts in Tennessee have not recognized a separate claim for common law commercial disparagement, they have stated that if it is recognized, it will follow the same section of the Restatement that Massachusetts law recognizes. *Kansas Bankers Sur. Co. v. Bahr Consultants*, 59 F. Supp. 1004, 1014-1015 (E.D. Tenn. 1999). Commercial disparagement should be

5

considered a species of the common law cause of action for "injurious falsehood". *Id*. Unlike commercial disparagement, injurious falsehood does not require intent, but requires knowledge of the falsity of the statements or reckless disregard for the truth or falsity of the statements. *Id*. at 1016. *See also, Seaton v. Trip Advisor*, No. 3:11-cv-549 (E.D. Tenn. 2012) (defining parameters of commercial disparagement claims in Tennessee). It also requires harm to the pecuniary interests of the plaintiff, rather than harm to his property.

On the other hand, in *Medison America v. Preferred Medical Systems, LLC*, 548 F. Supp. 547, 571 (W.D.Tenn. 2007), the court found that "[u]nder the common law of Tennessee, there are no causes of action entitled 'Trade Slander' or 'Commercial Disparagement.'" Instead, the *Medison America* court converted the disparagement claim into one of defamation, requiring a showing that "1) a party published [by communicating to a third person] a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Id*., *quoting Sullivan v. Baptist Mem'l Hosp*., 995 S.W.2d 569, 571 (Tenn.1999).[2]

This uncertainty over the proper treatment of commercial disparagement extends even to a quandary in the appropriate statute of limitations analysis. Commercial disparagement requires harm to the business, title or property of the plaintiff. Accordingly, the appropriate statute of limitations for this tort would fall under the statute of limitations for property tort actions, addressed in Title 23, Chapter 3, Section 105 of the Tennessee Code, and endures for three years. On the other hand, if commercial disparagement is to be construed as a form of injurious

---

[2] Accordingly, Plaintiff ATC has amended its complaint to include claims for defamation and injurious falsehood.

falsehood, then the tort is personal and the statute of limitations would be covered under Title 23, Chapter 3, Section 104, with a statute of limitations of one year.

It is clear Tennessee courts consider a claim for commercial disparagement potentially viable, but differ greatly on how such a claim should be handled. Massachusetts, on the other hand, embraces the Restatement definition of commercial disparagement. Consequently, the outcome of this case will be affected by the choice of law, and a conflict of laws issue arises.

B. <u>The Factors to be Considered Using Massachusetts' Functional Approach to Choice of law Favors Choice of Massachusetts law</u>.

Once a conflict of laws issue is identified, as it is here, Massachusetts courts employ a functional approach, using the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) as a guidepost – although not an exclusive one. *Bushkin Assocs, v. Raytheon Co*., 393 Mass. 622, 631-632 (Mass. 1985).

1. Place of Injury Doctrine Leans Toward Choice of Tennessee Law

For torts claims such as considered here, the place of injury remains an important factor under Massachusetts law. *See, e.g., Pevoski,* 371 Mass. at 359 ("[lex loci delicti] has provided, and will continue to provide, a rational and just procedure for selecting the law governing the vast majority of issues in multi-state tort suits."); *Ahmed v. Boeing Corp*., 720 F.2d 224, 226 (1st Cir. 1983); *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333 (Mass. 1983)(lex loci delicti "ordinarily" determines choice of law); *Cont'l Cablevision v. Storer Broad. Co.*, 653 F. Supp. 451, 454 (D.Mass. 1986) ([lex loci delicti] no longer strictly controls choice of law questions [but]…provides a useful rule for most multi-state torts.").

The place of injury is considered to be the site where "the last event necessary to make an actor liable for an alleged tort takes place." *Cohen v. McDonnell Douglas Corp.*, 389 Mass. at 333-336. After devoting three pages of analysis on this question, the *Cohen* Court concluded that Massachusetts law should apply because that is where the injuries occurred.

In this case, this question is even closer. The elements of commercial disparagement in Massachusetts are: a false statement intended to call into question the quality of a competitor's goods or services in order to inflict pecuniary harm. *Picker Int'l Inc. v. Leavitt*, 865 F. Supp. 951, 964 (D.Mass. 1994), *citing* RESTATEMENT (SECOND) OF TORTS, § 623A (1979). Arguably, all of these elements were completed once the article and other activities were performed. Since these were all performed in Massachusetts that would be the site of injury.

However, comment e to Section 146 of the Restatement provides that, where tortious conduct occurred in one state and injury in another, then, "[i]n such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort." *Cohen,* 389 Mass. at 336. Since the injury here occurred at ATC's sole office in Tennessee, then Tennessee should prevail since it would be considered the site of injury.

    2.   Other Factors Used in Choice of Law Cases Weigh Heavily Against Choice of Tennessee Law.

Although place of injury remains an important - even presumptive factor - in choice of law in Massachusetts, *Bushkin,* 393 Mass. at 631-632, also calls for other factors to be considered beyond lex loci delicti. These factors are: 1) predictability of results; 2) maintenance of interstate and international order; 3) simplification of the judicial task; 4) advancement of the forum's governmental interests; 5) application of the better rule of law. *Id*. at 634, citing R.A. Leflar, AMERICAN CONFLICTS LAW at 195.

In this case, predictability of results, simplification of the judicial task and application of the better rule of law all militate heavily in favor of application of Massachusetts law. Given the nascent, shape-shifting quality of commercial disparagement law in Tennessee, a federal court in Massachusetts would probably be the best forum to establish precedents in this area. This is particularly so where the court could choose to follow the analytical framework supplied by well-defined law in Massachusetts.

## **Conclusion**

This case presents choice of law issues because the facts occurred in multiple jurisdictions and the outcome will differ depending on the law invoked.  Although the place of injury could be considered in Tennessee, given the uncertainty of commercial disparagement law in that state, other factors used in a choice of law analysis weigh heavily toward choice of Massachusetts law.

Respectfully submitted,

___/s/_____*Timothy Cornell*_____

Etna, NH  
March 25, 2012

Timothy Cornell  (BBO#654412)  
Mueller Law PLLC  
130 Trescott Rd.  
Etna, NH 03750  
(603) 277-0838  
Timothy.cornell@muellerlaw.com

**CERTIFICATION OF SERVICE**

I certify that a true and correct copy of this document has been filed electronically through ECF, that it will be available for viewing and downloading electronically, and that service will be made to Plaintiff's Counsel through the ECF system on March 25, 2013.

Respectfully submitted,

__/s/_____*Timothy Cornell*_____

Etna, NH  
March 25, 2012

Timothy Cornell  (BBO#654412)  
Mueller Law PLLC  
130 Trescott Rd.  
Etna, NH 03750  
(603) 277-0838  
Timothy.cornell@muellerlaw.com