UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
ADVANCED TECHNOLOGY             )
CORPORATION, INC.               )
                               )
          Plaintiff,            )
                               )
          v.                    )       CIVIL ACTION
                               )        NO. 1:12-cv-10171-WGY
INSTRON, INC.,                  )
                               )
          Defendant.            )
_____)
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    December 18, 2014

## I.    INTRODUCTION

Advanced Technology Corporation, Inc. ("ATC") brings this
suit against Instron, Inc. ("Instron") claiming commercial
disparagement.  Essentially, ATC alleges that Instron published
a magazine article that readers could infer was about ATC's
technology.  ATC claims that this inference reflected negatively
on its products and caused it to lose client sales.  Instron now
moves for summary judgment under Federal Rule of Civil Procedure
56.  Because ATC has failed to provide sufficient evidence of
special damages, the Court GRANTS the motion.

### A.    Procedural Posture

The complaint and first amended complaint were filed
January 30, 2012, Compl., ECF No. 1; Compl., ECF No. 4.  Instron

filed a motion to dismiss on June 1, 2012. Def. Instron's Mot.

Dismiss, ECF No. 23. On February 26, 2013, Judge Tauro granted

Instron's motion to dismiss for Counts I and II, and denied its

motion with respect to Count III. Order, February 26, 2013, ECF

No. 47. ATC then filed a second amended complaint on March 25,

2013, Second Am. Compl., ECF No. 52,[1] and Instron renewed its

motion to dismiss on April 9, Def. Instron's Renewed Mot.

Dismiss, ECF No. 57. On October 28, 2013, the case was

reassigned to this session of the Court. Electr. Notice, ECF

No. 66. This Court denied Instron's renewed motion to dismiss

on December 17, 2013, and placed this case on the running trial

list for September 2014. Electr. Clerk's Notes, ECF No. 73.

On May 30, 2014, Instron filed a motion for summary

judgment and an accompanying memorandum in support. Def.

Instron's Mot. Summ. J., ECF No. 105; Mem. Supp. Def. Instron's

Mot. Summ. J. ("Instron's Mem."), ECF No. 106. ATC filed a

memorandum in opposition to the motion on June 20, 2014. Pl.

Advanced Technology Corp., Inc.'s Mem. Opp'n Def. Instron's Mot.

Summ. J. ("ATC's Opp'n"), ECF No. 116. On June 27, 2014,

---

[1] There were four original defendants in both the complaint and the first amended complaint. Compl., ECF No. 1; Compl., ECF No. 4. Three defendants were dismissed at various stages ot the litigation, see Stipulation Dismissal, ECF No. 27; Order, ECF No. 47, leaving Instron as the sole defendant. The second amended complaint was filed exclusively against Instron. Second Am. Compl.

Instron filed its reply. Reply Supp. Def. Instron, Inc.'s Mot. Summ. J. ("Instron's Reply"), ECF No. 121. A hearing regarding the motion for summary judgment was held July 10, 2014, at which time the Court took the matter under advisement. Electr. Clerk's Notes, ECF No. 127.

**B.   Factual Background**

ATC is a Tennessee corporation that manufactures the Stress-Strain Microprobe System, a testing system based on a method called automated ball indentation ("ABI").[2] Second Am. Compl. ¶¶ 5, 7. This method "measure[s], non-destructively, tensile properties (yield strength, ultimate strength, stress-strain curve, ductility), and fracture toughness of materials and components on site without the need to cease operation and cut test samples." Id. ¶ 7. The two major advantages ABI has over the conventional, destructive tensile test are that it is fast and nondestructive. Id. ¶ 8. The "hallmark of ABI is its 'partial unloading technique,' whereby force is applied to a metal, partially removed, and then increased further in multiple intervals." ATC's Opp'n 2.

Instron, a Massachusetts subsidiary of Illinois Tool Works, Inc., an Illinois company, is an important player in the market for the more conventional destructive variety of tensile-testing

---

[2] According to ATC, the Stress-Strain Microprobe System "is the only equipment that employs ABI technique." Second Am. Compl. ¶ 20.

equipment.  Second Am. Compl. ¶¶ 6, 13-14.  ATC claims that its
nondestructive technique threatened Instron's established
business in this market.  Id. ¶ 13.  According to ATC, Instron
reacted to this threat by using "its employees' positions on key
national and international standards organizations to promote
measures that would discredit the ABI technique."  Id. ¶ 21.

One such employee was Edward Tobolski ("Tobolski"), who
served on an industry committee "tasked with evaluating drafts
of ABI test methods."  Resp. Pl. Advanced Tech. Corp., Inc.
Def.'s Statement Undisputed Material Facts Supp. Mot. Summ. J. &
Advanced Tech. Corp., Inc.'s Statement Facts Genuine Issue Be
Tried ("PSF") ¶¶ 13-14, ECF No. 117.  According to ATC, Tobolski
attempted to identify the ABI technique with an unrelated
technique used by Instron, called instrumented indentation
testing ("IIT").  Second Am. Compl. ¶¶ 24-26; see also PSF ¶¶
18-25 (describing Tobolski's alleged activities as a member of
the standards committee linking ABI and IIT).  Unlike ABI, IIT
"cannot be performed in the field on any pipeline and cannot
produce yield strength or other tensile or fracture toughness
properties."  Second Am. Compl. ¶ 27.  Therefore, ATC contends
that any attempt to portray the two techniques as
interchangeable would be inaccurate.  Id. ¶ 30.

In 2009, Tobolski and another Instron employee, Bill
O'Neill, co-authored an article published in the February 2009

issue of Advanced Materials & Processes, an industry magazine
read by more than 39,000 people.[3]  PSF ¶¶ 39-41.  The article
discussed the International Standards Organization ("ISO")
Technical Report TR 29381 - written at least in part by Tobolski
himself, see id. ¶¶ 26-28 - which "describe[d] three methods for
determining metal tensile strength properties by using . . .
IIT, a non-destructive testing method."  Instron's Mem. 3
(footnote omitted).  One of the methods mentioned in both the
ISO report and the magazine article was "RSS," the name used by
Frontics, a competing company, for its method that purportedly
mimics ABI.  ATC's Opp'n 6-7; PSF ¶¶  26-27, 36.  Describing RSS
as a particularly promising test, the article noted that the
method involved "periodic partial unloadings" and was designed
to facilitate in situ testing of pipelines.  PSF ¶ 44-45.  The
article also suggested, however, that the method was "still
under development" and that its accuracy had yet to be fully
determined.  Id. ¶ 46.  ATC argues that "[b]ecause 'RSS' was
unknown at the time the [a]rticle was published, while ABI had
for years been a well-known and well-respected testing method,
the hallmark of which was a 'partial unloading' technique, those
reading the [a]rticle were likely to believe that it was
discussing ABI."  PSF ¶ 47.  ATC contends that the article

_____

[3] Edward Tobolski was a retired Instron employee when the
article was written.  Statement Undisputed Material Facts Supp.
Def. Instron's Mot. Summ. J. ¶ 4, ECF No. 107.

caused it to lose a sale to one of its clients, Vectren, and to
lose projected growth.  ATC's Opp'n 13-14.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is proper if the moving party shows, based
on the materials in the record, that "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue
of material fact is genuine if "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1985).  The
materiality of a fact depends on the substantive law of the
case, and only factual disputes that might affect the outcome of
the suit can properly preclude summary judgment.  Id.

When deciding a motion for summary judgment, the Court
views the record "in the light most favorable to the non-moving
party and draw[s] all reasonable inferences in their favor."
Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).  Summary
judgment must be granted if, after adequate time, the non-moving
party "fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B.  Commercial Disparagement Requirements

Commercial disparagement goes by many names, including injurious falsehood, slander of goods, and trade libel.  First Act Inc. v. Brook Mays Music Co., Inc., 429 F. Supp. 2d 429, 432 n.1 (D. Mass. 2006) (Harrington, J.).  A lawsuit based on commercial disparagement "seek[s] to impose liability on a defendant for harm sustained by a plaintiff as a result of the publication of a false statement about the plaintiff." HipSaver, Inc. v. Kiel, 464 Mass. 517, 522 (2013).  The scope of liability is defined as:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Dulgarian v. Stone, 420 Mass. 843, 852 (1995) (quoting Restatement (Second) of Torts § 623A (1977) (internal quotation marks omitted).  It is black-letter law in Massachusetts that a plaintiff pursuing a commercial disparagement claim bears the burden of proving that:

> [The] defendant (1) published a false statement to a person other than the plaintiff; (2) "of and concerning" the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss.

<u>HipSaver</u>, 464 Mass. at 523.

> **1. False Statement**

In a commercial disparagement case, the plaintiff bears the burden of proving that the statements were false. <u>Id.</u> at 524. Instron claims that ATC cannot prove that the statements Tobolski and O'Neill made in the article are false. Instron's Mem. 7. According to Instron, there are no false statements in the article because the article was about IIT, not ABI; because it discussed the methods used by Frontics, a competing company, rather than those used by ATC; and because it did not at any point explicitly mention either ATC or its ABI method. <u>See</u> Instron's Reply 3. Instron correctly observes that the falsity of the statements made in the article depends on the reader drawing the inference that the article was discussing ABI. <u>Id.</u> at 5. The question of whether a reader might make this inference will be discussed below; to clarify the analysis of the falsity of the statements made in the article, such an inference will be assumed.

> **a. The Statements Are False with Respect to ABI**

ATC claims that a reader would likely have inferred that the article was discussing ABI, and to that extent, the article was false. ATC's Opp'n 7-8. ATC first argues that the article misled readers into the belief that ABI was a form of IIT

because it discussed the "partial unloading" method, the hallmark of ABI, under a subheading discussing three methods of IIT. See PSF ¶¶ 42-45. ATC also contends that the article "describe[d] and depict[ed] in a technically flawed manner the ABI 'periodic partial unloading' technique." Id. ¶ 57. To prove that the article was false, ATC cites the article's descriptions of ABI as "new," and its statements that "much work is being done to determine its accuracy"; it is "still under development"; and "preliminary testing has shown a 5% to 10% correlation between RSS and traditional [destructive] methods for determining tensile properties, to prove that the article was false. PSF ¶¶ 43, 46. Lastly, ATC states that a reader may have incorrectly assumed that RSS and ABI "fell into the same category as IIT." ATC's Opp'n 10. ATC contends that readers would have therefore assumed that RSS was "newer" and "more promising" than ABI, and that "RSS's 5-10% correlation rate was better than that of ABI." Id.

To prove the falsity of these claims, ATC states that "ABI is not IIT," that it "is not new or untested," that it "had been marketed and used by industry players in over 20 countries across the world since the early 1990s," and that it "has participated in multiple inter-laboratory studies and evaluations to test its efficacy and reliability." PSF ¶ 50-52, 55. Furthermore, ATC claims that "ABI's results concerning

yield strength as correlated to traditional, destructive tensile testing have been publicly available since 1990 . . . and they show a correlation between traditional testing that is considerably lower than 5%." Id. ¶ 54. ATC also notes that its expert is ready to testify that "by 2009, the ABI test method had been fully developed and established as reliable, accurate, and accepted widely by the metals testing industry." ATC's Opp'n 9. Additionally, ATC states that "RSS is not more promising than ABI," as it "has several conflicting equations for the representative strain which is not equal to true-plastic strain, and lacks precision." PSF ¶ 56 (internal citations omitted).

Instron contends that the statements as made were true and that their positive tone (for instance, describing the technology as "promising") means that the statements could not support a commercial disparagement claim. Instron's Mem. 8. This argument is unavailing. As a preliminary matter, the tone of the statements are irrelevant to their falsity – and Instron offers nothing to rebut ATC's argument that the article incorrectly portrayed ABI as untested and possibly inaccurate compared to traditional methods. Even if the Court does take the positive tone into account, and remembering that at this stage the Court must view the evidence in the light most favorable to ATC, the article could be seen as damning ABI with

faint praise.  Accordingly, the Court believes that ATC has

proferred sufficient evidence of falsity to pass the summary

judgment stage.

   **b. The Statements Are Not Protected Opinions**

  Instron contends that the statements made in the article

are opinions and are therefore protected under the First

Amendment.  Instron's Mem. 9.  According to Instron, the

"protection extends to 'imprecise' statements that are qualified

with 'broad descriptive terms, susceptible to varying

interpretations.'"  Instron's Reply 7 (quoting ARCADD, Inc. v.

Dupuis, No. 073797, 2010 WL 3038952, at *4-5 (Mass. Super. Ct.

July 13, 2010)).  It alleges that the statements at issue "fall

squarely into these categories," id. at 8, and claims that even

if Tobolski's opinions were based on misstatements of fact, they

would still be protected under the First Amendment, Instron's

Mem. 9.

  To analyze whether the article is protected opinion, this

Court will import the relevant law from the defamation context.

This approach is reasonable, as HipSaver similarly looked to the

law of defamation to sketch out the contours of a commercial

disparagement action.  See HipSaver, 464 Mass. at 527 ("[T]he

similarities between the two torts suggest that this element is

equally relevant and essential to an action for commercial

disparagement.").

The Supreme Court has held that there is not a "wholesale defamation exemption for anything that might be labeled 'opinion.'"  Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990).  Noting that there need not be an "artificial dichotomy" between facts and opinions, the Supreme Court ruled that statements of opinion that "imply an assertion of objective fact" are actionable.  Id. at 18-19.  It further held that "statements that cannot reasonably [be] interpreted as stating actual facts," including "imaginative expression [and] rhetorical hyperbole," are protected.  Id. at 20 (first alteration in original) (internal quotation marks omitted); see also Lyons v. Globe Newspaper Co., 415 Mass. 258 (1993).  When determining whether statements of opinion are protected, a court must view them in context, including all words used and the surrounding circumstances.  See Lyons, 415 Mass. at 263; Milkovich, 497 U.S. at 17 ("[A]n appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)) (internal quotation marks omitted)).

Under its opinion theory, Instron argues that "Tobolski held the good faith opinion that ATC's ABI technique was

properly considered a form of [IIT] and that ATC's product
performs non-destructive testing using an automated instrument
and computer software that is comparable to Frontics' product."
Instron's Mem. 9.[4]  Under the opinion framework laid out above,
however, the issue is not whether the author held his opinion in
good faith, but is instead whether the statements he made could
reasonably be understood to assert facts.  See Milkovich, 497
U.S. at 20.  For the purposes of summary judgment, the
statements in the article satisfy the test.

    The article discusses the ISO report that reviews three
methods of IIT used to determine tensile properties of metals.
PSF ¶ 43; ATC's Opp'n 7.  It describes RSS as the "most
promising" method and provides preliminary testing results
reporting its accuracy compared to traditional destructive
testing methods. PSF ¶ 44, 46; ATC's Opp'n 7.  Because the
article states that IIT "has been used for many years," PSF ¶
42; ATC's Opp'n 7, it would be reasonable for a reader to infer

---

    [4] Instron further states, albeit somewhat indirectly, that
although the court in HipSaver ruled that pure opinions are not
actionable in defamation cases, it left for another day the
question as to whether pure opinions are actionable in
commercial disparagement cases.  See Instron's Reply 8.  It is
more accurate to state that the HipSaver court left for another
day the question of whether opinions implying undisclosed
defamatory facts are actionable in commercial disparagement
cases, not whether pure opinions are protected.  HipSaver, 464
Mass. at 526 n.11.  As ATC aptly notes, "HipSaver did not
insulate expressions of opinion from commercial disparagement
liability."  ATC's Opp'n 16.

that the author was aware of other IIT testing methods besides those discussed in the ISO report.  Therefore, the article's failure to mention the other IIT methods when describing "the most promising" methods in the report could have led readers to the reasonable understanding that there were no IIT methods that were more accurate - a statement of fact, not of mere opinion.

Taking all reasonable inferences in favor of ATC, as required for summary judgment, the Court concludes that the statements in the article could reasonably be understood to assert facts and therefore do not constitute opinions for the purposes of this analysis.

> ### c. The Statements Are Not Protected Scientific Debate

Instron also points to <u>ONY, Inc.</u> v. <u>Cornerstone Therapeutics, Inc.</u>, 720 F.3d 490 (2d Cir. 2013), which states that "scientific conclusions about unsettled matters of scientific debate" are protected from commercial disparagement liability.  Instron's Reply 7-8 (internal quotation marks omitted).  In <u>ONY</u>, the Second Circuit held that conclusions on issues of continued scientific debate are protected, so long as non-fraudulent data is used and the author accurately discloses the data and methodology used to form the conclusions.  720 F.3d at 498; <u>cf.</u> <u>United States ex rel. Jones</u> v. <u>Brigham & Women's Hosp.</u>, 678 F.3d 72, 88 (1st Cir. 2012) (holding in a similar

context that data revisions in scientific research studies did not present "questions of scientific judgment," but instead presented an issue as to "whether the data was falsified"). Applying this rule to the facts before it, the ONY court ruled that the article at issue was not actionable because it was published in a scientific journal and it disclosed the tests and methodologies the author used to reach his conclusion. ONY, 720 F.3d at 498. The court reasoned that such tentative conclusions are part of the scientific method, whereby scientists utilize empirical data to form conclusions that are then subjected to the scrutiny of the scientific community. Id. at 496-97. The article's appearance in a scientific journal was also important, as the scientific community understands that conclusions based on empirical data are open to further experimentation, acceptance, or rejection. Id.

Here, Instron offers no facts to demonstrate that the article disclosed any information regarding the methodology or data used in the ISO report or in the article. See Instron's Mem.; Instron's Reply. The fact that the article appeared in a scientific magazine is of no moment, as ONY, Milkovich, and Lyons each emphasized the need for disclosing the factual basis of the statements at issue. Here, Instron has failed to provide evidence that the article satisfied this test. Accordingly, Instron's argument that the article is protected as ongoing

scientific debate is unconvincing.

### 2. Of and Concerning the Plaintiff

#### a. Instron Intended to Refer to ATC, or Readers Reasonably Inferred the Article Referred to ATC

Massachusetts law provides that the "of and concerning" element is satisfied when the plaintiff proves:

> [E]ither (1) that the defendant intended the words to refer to the plaintiff and that they were so understood or (2) that persons could reasonably interpret the defendant's words to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood.

HipSaver, 464 Mass. at 528 (quoting ELM Med. Lab., Inc. v. RKO Gen., Inc., 403 Mass. 779, 785 (1989)) (internal quotation marks omitted). Instron contends that ATC does not state a claim for commercial disparagement because the article does not mention ATC, ABI, or Haggag. Instron's Mem. 7. This fact is not dispositive, however, as the law does not require a direct reference to the plaintiff.

#### i. Intent

ATC contends that the first means of satisfying the "of and concerning" element is met, as Tobolski purportedly intended for readers to think the article referred to ABI. ATC's Opp'n 15 (citing PSF ¶ 48 (noting that Tobolski admitted in a deposition that he knew readers could make this inference)). Drawing all reasonable inferences in ATC's favor, this Court believes that

16

Tobolski's <u>knowledge</u> that readers could view the article as talking about ABI could reasonably imply that he <u>intended</u> for readers to make this connection.  In addition to demonstrating intent, ATC also provides the requisite evidence that the article was actually understood to refer to its technology: three of its customers believed that the article referred to ABI.[5]  PSF ¶ 49.

Thus, ATC has provided sufficient evidence for summary judgment purposes showing that the article made statements "of and concerning" the plaintiff because it can demonstrate that Instron intended the words to refer to ABI, and that the words were understood to refer to ABI.  Even if these facts were insufficient to satisfy this part of the test, however, the asserted facts also meet the requirements of HipSaver's second means of fulfilling the "of and concerning" element.

## ii.  Negligence

---

[5] The first such customer was an engineer at one of ATC's potential client companies, Vectren, who stated that when he read the article, both ATC and Frontics came to mind.  Aff. Tara J. Myslinski ("Myslinski Aff."), Ex. 4, Dep. John K. Cline ("Cline Dep.") 87-89, 97-98, ECF No. 118-4.  The second was an engineer with an organization within ATC's former client company, PG&E; he stated that, as he read the article for the first time during his deposition, he believed the article was "describing a process similar to what the Frontics system uses . . . [a]nd it [d]id have some similarities to the way the ATC system operates."  Myslinski Aff., Ex. 5, Dep. Alexander Gutierrez 159:11-18, ECF No. 118-5.  Third, ATC has produced emails that indicate there was some kind of confusion between ABI and IIT by people involved with a business proposal with ATC.  See Myslinski Aff., Ex. 20, ECF No. 118-20.

The second way the "of and concerning" test can be met is if the plaintiff proves "that persons could reasonably interpret the defendant's words to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood." Hipsaver, 464 Mass. at 528 (quoting ELM, 403 Mass. at 785). ATC contends that the article's discussion of "partial unloading" – a key feature of ABI – would reasonably lead readers to believe that the article was about ABI rather than the "unknown" RSS. PSF ¶ 47. Bolstering this claim, ATC points to three of its customers who did in fact believe that that article was at least possibly discussing ABI. Id. ¶ 49. Such evidence satisfies, for the purposes of summary judgment, the first part of the negligence test.

Turning to the second part of the test – whether Instron was negligent in publishing content that could be understood as referring to ATC – Instron's representative, Tobolski, admitted that at the time he wrote the article he thought that people reading it could believe the technique being discussed would refer to the pre-existing ABI process, even though he also averred that he intended it to refer to a "new process." Id. ¶ 48. Accordingly, this Court rules that this evidence of Tobolski's decision to frame the article as he did, despite

knowing that readers might think he was talking about ABI rather than some other technique, suffices to show for the purposes of summary judgment that Instron's statements were "of and concerning" the plaintiff.

> **b.     Disparagement of Group Requires Demonstration that Reader Inferred Reference to Plaintiff**

In cases where there is no direct reference to a plaintiff by name or the plaintiff is not "identifiable from the descriptive matter in the publication," the plaintiff must provide "extrinsic facts" to demonstrate that some third party understood that the statement referred to the plaintiff. HipSaver, 464 Mass. at 528 (quoting Brauer v. Globe Newspaper Co., 351 Mass. 53, 56 (1966)).  Where statements pertain to a group, an individual may not recover "unless the group or class is so small that the matter can reasonably be understood to refer to the member, or . . . the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member."  Id. (alteration in original) (internal quotation marks omitted).

Instron asserts that ATC's disparagement claim is unsupportable because the plaintiff may not prevail in cases where a statement disparages a group – here, the other companies with techniques purportedly less accurate than RSS – unless it is reasonable to understand that the statements refer to that

specific member of the group.  Instron's Reply 4.  Although an
accurate statement of the law, ATC's evidence rebuts Instron's
broad assertions.  Here, although ATC does not directly address
the issue, it claims that ATC and Frontics "were the only two
companies in the world who had products that could perform non-
destructive tensile testing of metals."  PSF ¶ 27.  This narrows
the group members to an irreducible minimum wherein it would be
reasonable to infer that the statements referred to ATC.  <u>See</u>
<u>Arcand</u> v. <u>Evening Call Publ'g Co.</u>, 567 F.2d 1163, 1165 (1st Cir.
1977) ("[D]efamation, encompassing a considerable proportion of
the group, can be seen as a blanket slur, reaching all."); <u>Gross</u>
v. <u>Cantor</u>, 270 N.Y. 93, 95-96 (1936) (holding plaintiff provided
sufficient allegations to raise issue whether he was
individually implicated in article referring to group consisting
of twelve members).  Even setting aside this argument by way of
statistics, ATC provides reasons (discussed above) as to why a
reader would believe the article referred to ABI, as well as
evidence demonstrating that third parties did actually believe
the article discussed ABI.  For these reasons, ATC has satisfied
its burden on this point.

    **c. Reference to Competitor's Product Does Not**
      **Disprove "Of and Concerning" Element**

  Instron argues that <u>HipSaver</u> provides this Court with
strong reason to conclude that ATC did not establish that the

article is "of and concerning" ABI.  Instron notes that whereas
in Hipsaver, the relevant article did not mention any product
name, here it is reasonable for one to infer that Tobolski's and
O'Neill's article was not "of and concerning" ATC, because it
explicitly mentioned RSS, "the name of a competitor's product,
not ATC's."  Instron's Reply 4-5 (emphasis in original).
Instron's argument is unconvincing.  In HipSaver, the court held
that HipSaver, the plaintiff, failed to assert sufficient
evidence to conclude that the article at issue discussed its
product because it was not reasonably implicated in the article.
464 Mass. at 528-29.  HipSaver marketed its product in a way
that distinguished it from the product discussed in the article
at issue which, unlike Hipsaver's product, was not commercially
available.  Id.  Moreover, while the purportedly defamatory
article described a hard plastic frame placed on one hip,
HipSaver's product was marketed as a soft foam protector and
covered both hips.  Id. at 529.  The court also emphasized that
plaintiffs failed to provide any "affidavits from third parties
prepared to testify that they understood the article as
referring to or being about [the plaintiff] and its product."
Id.  The court ruled that these differences meant that HipSaver
could not demonstrate that it was reasonable for readers to
infer that the article in question made statements "of and
concerning" its product.  See id.

Here, ATC has provided reasons why a reader reasonably would have inferred the article discussed ABI, despite the fact that the article explicitly mentioned a competitor's product. Additionally, unlike the plaintiff in HipSaver, ATC has in fact provided deposition and email evidence stating that some customers actually believed that the article was discussing ABI. ATC's Opp'n 15. For these reasons, Instron's argument that HipSaver requires a ruling in their favor is not persuasive.

### d. Inference of Exclusive Reference to Plaintiff Unnecessary

Instron further argues that ATC's evidence of reader confusion is unpersuasive because the testimony indicates either that readers merely thought of ABI when reading the article, or that readers believed the article discussed both ATC's and Frontics' technology. Instron's Reply 6-7. According to Instron, the fact that a reader merely thought of ABI "hardly means that the reader would conclude that 'RSS' meant ABI, not RSS." Id. at 7. Although the logic of this argument holds some sway, it does not appear strongly to rebut ATC's reasoning as to why readers may have assumed the article discussed ABI. Furthermore, to the extent that readers may have thought of both ABI and Frontics' technology while reading the article, the case law does not seem to require that the reader understand the statement as exclusively discussing the plaintiff. HipSaver

noted that Massachusetts case law on commercial disparagement is scarce, but the language is clear that the plaintiff must prove that "persons could reasonably interpret the defendant's words to refer to the plaintiff." HipSaver, 464 Mass. at 524, 528. So long as a purportedly defamatory statement can be understood to actually be referring to a particular plaintiff, this Court will not read into the law an additional requirement that the statement be only about that particular plaintiff.

Drawing all reasonable inferences in favor of ATC, as is required for summary judgment, Instron's argument discounting ATC's evidence is unpersuasive. Accordingly, the Court holds that ATC has satisfied the "of and concerning" element.

### 3. With Knowledge or Reckless Disregard of the Statement's Falsity

To be liable for commercial disparagement, a defendant must have published the contested statements "with knowledge that they were false, or with reckless disregard for their truth or falsity." HipSaver, 464 Mass. at 529. This element mirrors the "actual malice" requirement in a defamation case. Id. at 530.

In support of Instron's position, Tobolski said during his deposition that he "[held] a good faith belief that both RSS and ABI [fell] into the umbrella category of 'IIT,'" PSF ¶ 61, and that "RSS and ABI were the same, apparently in all respects relevant to the statements in the [a]rticle," id. ¶ 63. Instron

also argues that Tobolski had a good faith belief that "ATC's product perform[ed] non-destructive testing using an automated instrument and computer software that [was] comparable to Frontics' product."  Instron's Mem. 9.  Furthermore, Instron states that "Tobolski's belief was based on his 35 years of experience in the industry as well as the same common-sense view shared by other members of relevant . . . ISO subcommittees." Id.

In response, ATC points to specific facts demonstrating the plausibility that Tobolski was aware, or should have been aware of the falsity of the statements.  It asserts that Tobolski could not point to an individual or an industry consensus that held that RSS and ABI were similar in the aspects relevant to the article.  ATC's Opp'n 12.  According to ATC, Tobolski's work on standard-setting committees provided him sufficient exposure to ABI to become "intimately familiar with the ABI technology" and to become "well aware of ATC's commercial interest in securing national and—international standards concerning its ABI test method."  Id. at 17.  Tobolski "felt he was enough of an authority on [ABI] to comment substantively on draft standards for ABI . . . [and] to rename it 'IIT' and spearhead the dissolution of committees tasked with standardizing ABI."  Id. ATC asserts that Tobolski "understood that ABI had been well tested, was not new, and that it enjoyed widespread adoption by

the pipeline industry." Id. As a result, ATC states that Tobolski knew that the article's statements regarding the novelty and lack of testing of the relevant technology were false, if applied to ABI. Id. Despite this, Toboloski did not verify the truth of the article with respect to ABI. Id. at 12-13.

Viewed in the light most favorable to ATC and drawing all reasonable inferences in ATC's favor, one could reasonably infer that Tobolski either knew of or recklessly disregarded the truth or falsity of the article. Because Tobolski was familiar with the ABI technology, one could reasonably assume that, at the very least, he may have been aware of the potential for factual falsity. Since Tobolski believed that ABI was a subset of IIT, Instron's Mem. 9, and that readers might think of ABI when reading the article, PSF ¶ 48, his decision to publish the article without confirming that the information was accurate in relation to ABI, id. ¶ 66, can reasonably be inferred to constitute reckless disregard for the article's truth or falsity.

ATC has thus provided sufficient evidence to assert that Tobolski published the article when he knew that it was false, or recklessly disregarded the article's truth or falsity, and therefore the Court holds that this element survives summary judgment.

### 4.   Pecuniary Harm Was Intended or Foreseeable

ATC must also prove that Instron "intend[ed] for
publication of the statement to result in harm to [the]
interests of the [plaintiff] having a pecuniary value, or either
recognize[d] or should [have] recognize[d] that it [was] likely
to do so." HipSaver, 464 Mass. at 534 (second alteration in
original) (internal quotation marks omitted).  Instron claims
that ATC has provided no evidence of intent or foreseeability.
Instron's Mem. 11; Instron's Reply 9.

ATC contends that pecuniary harm was intended or
foreseeable to Tobolski because "Haggag was not shy about
letting Tobolski know that Haggag would not permit ABI to be
lumped into the category of 'IIT' because he felt it was
denigrating to his technique and business."  ATC's Opp'n 17.  If
such knowledge did not cause Tobolski to recognize that the
publication was likely to result in pecuniary harm to ATC, at
the very least, it put Tobolski on notice that the article could
have negative pecuniary effects on ABI.  Therefore, ATC provides
evidence from which a jury could find such harm was either
intended or foreseeable.

ATC makes additional arguments suggesting that Tobolski
intended to harm ATC by publishing the article.  Id. at 17-18.
ATC states "it is fair for the Court to infer on these facts
that Tobolski knew – being an employee of Instron, a

traditional, destructive tensile testing company – that a benefit to Haggag in the form of an internationally-accepted standard for ABI (an alternative to a traditional, destructive test) meant harm to his company, Instron." Id. In response, Instron states that ATC's claim is "utterly illogical" because an article that "praises IIT by recognizing the 'growing need for in situ testing'" would not "protect the market share of Instron's destructive test." Instron's Reply 9. Instron further argues that ATC's suggestion that Tobolski had something to gain is meritless because Tobolski was retired from Instron at the time he made the statements at issue. Id.

Instron's assertion that the article did not benefit Instron is persuasive, but a reasonable inference in ATC's favor may rebut the argument. While the article highlighted the need for in situ testing, it also contained indirect criticism, as it indicated that the technology was still under development and yielded less accurate results than the traditional testing method. PSF ¶ 46. Such statements regarding a competitor's products might reasonably discourage future sales, thus providing temporary market share protection and, as such, a permissible inference of intended or foreseeable pecuniary harm. See First Act Inc., 429 F. Supp. 2d at 435-36 (finding defendant intended, or reasonably should have recognized publication which

"impugn[ed] the design and quality of [plaintiff's product]"
would cause pecuniary loss).

Accordingly, the Court holds that ATC has provided
sufficient evidence that pecuniary harm was foreseeable.

### 5. Special Damages in the Form of Pecuniary Loss

To establish a claim for commercial disparagement, the
plaintiff must demonstrate pecuniary loss that "directly and
immediately" resulted from the publication of the false
statements. HipSaver, 464 Mass. at 536; see also Karmaloop,
Inc. v. Sneider, No. 08-3580, 2013 WL 5612721, at *4 (Mass.
Super. Ct. Apr. 25, 2013) (Kaplan, J.) ("The special damages
rule requires that the plaintiff establish pecuniary loss that
resulted 'directly and immediately from the effect of the
conduct on third persons . . . .'"). Ideally, the plaintiff
should be able to show "a specific loss of sales to identifiable
customers." HipSaver, 464 Mass. at 536. In addition, "[w]hen
the loss of a specific sale is relied on to establish pecuniary
loss, it must be proved that the publication was a substantial
factor influencing the specific, identified purchaser in his
decision not to buy." Id. at 537 (alteration in original)
(quoting Restatement (Second) of Torts § 633 cmt. g (1979))
(internal quotation marks omitted).

In its motion for summary judgment, Instron claims that ATC
has not suffered special damages for the following four reasons:

(1) ATC lost no business from Cameron Ltd.; (2) ATC cancelled its consulting contract with PG&E; (3) ATC imposed commercially unreasonable conditions on its sale of equipment; and (4) Vectren did not purchase ATC's services because ATC's product did not deliver sufficiently reliable test results. Instron's Mem. 11-14. ATC did not dispute the first three claims in its opposition memorandum, but it does assert that there is "a genuine issue of fact" regarding the fourth claim. ATC's Opp'n 18.

> **a.    The Plaintiff Does Not Provide Sufficient Evidence of Direct and Immediate Pecuniary Loss**

ATC contends that "there is a genuine issue of fact as to whether Vectren decided not to hire ATC due to the [a]rticle." Id. According to ATC, one of its customers, Vectren, "was all but certain to hire ATC" before the article was published, but John Cline ("Cline"), a Vectren engineer, made the decision not to hire ATC "[i]mmediately after [he] read the [a]rticle" and discussed it with one of its authors. Id. at 18-19.

The record does not support the assertion that the article affected Vectren's decision not to hire ATC. Instead, the only evidence ATC provides is Cline's deposition testimony indicating that the article was not a factor in the decision not to hire ATC. During his deposition, Cline discussed why Vectren did not hire ATC:

> [F]irst of all, it [did not] give us the accuracy we
> need. . . . Secondly, it [was not] accepted by PHMSA .
> . . . [T]he third reason . . . [was that] it was
> becoming an uphill battle with Vectren for me to sell
> the technology . . . [b]ecause it did not have the
> accuracy we needed.  It was not approved by PHMSA, and
> it was something that I . . . didn't want to spend
> more time and money on because of the possible
> litigations that were . . . developing.[6]

Aff. Tara J. Myslinski, Ex. 4, Dep. John K. Cline ("Cline Dep.")
62:8-63:6, ECF No. 118-4.  Later, Cline explicitly stated
several times throughout his deposition that the article had no
effect on Vectren's decision not to hire ATC.  Id. at 136:2-5
("Our decision [not to hire ATC] was based entirely on the GTI
data and the fact that the technology had not been approved by
PHMSA.  Those were the two . . . key things for us."); id. at
84:8-20 (stating that the GTI testing results, along with the
"other reason" previously mentioned were the reasons Vectren
decided not hire ATC); id. at 104:21-24 ("[The article] didn't
cause me to really change my mind about ATC or Frontics.  It was

---

[6] In his deposition testimony, Cline stated, "Mr. Haggag
sent me an e-mail stating that he was going to pursue litigation
with some company, and at that point, I did not want to pursue
it any further so we just turned to the destructive testing."
Cline Dep. 62:20-24.  This Court can only assume that the
litigation mentioned in the email referred to the claims
currently before this Court.  Even if the email referred to
different litigation, the testimony does not supply sufficient
evidence to support the pecuniary damages element.  The
resulting decision not to hire ATC would not be a result of the
article itself, but would instead be the result of the prospect
of litigation.  Accordingly, this evidence does not support the
pecuniary loss element, as the article was not the "direct and
immediate cause" of the loss.  HipSaver, 464 Mass. at 536.

just the GTI data, plus the fact that it wasn't approved by

PHMSA.").

Because ATC has not provided sufficient evidence of special

damages, this element does not survive summary judgment, and

therefore the Court must grant the motion in favor of Instron.

### b. Ruling on the General Decline in Business or Lost Growth Unnecessary

On a separate, but related theory, ATC posits that <u>HipSaver</u>

did not rule out the possibility of showing special damages by

displaying "a general decline in business or lost growth

opportunity . . . [and] eliminat[ing] other possible

explanations for the decline." ATC's Opp'n 19 (alterations in

original) (quoting <u>HipSaver</u>, 464 Mass. at 536-37 & n.18). ATC

asserts that "Haggag plans to testify at trial that ATC had made

specific business forecast projections in the 2007 time period

that it failed to meet after the publication of the Article."

<u>Id.</u> This evidence, however, fails to "eliminate other possible

explanations for the decline," and thus fails to adequately link

the alleged decline to the publication of the article.

<u>HipSaver</u>, 464 Mass. at 537 n.18.

Additionally, Instron asserts that the business forecasts

do not provide "competent proof of damages." Instron's Reply

13. ATC does not identify the creator of the business

forecasts, but Instron infers that Haggag is the creator.

According to Instron, "Haggag lacks the expertise to reach such a judgment," and it notes that he testified that "he is not comfortable with basic accounting principles and would defer to others on such matters." Id. Furthermore, Instron argues that this Court should not adopt this theory, as the Supreme Judicial Court was "hesita[nt] to innovate the law governing proof of damages in a business disparagement case." Id. at 12.

In any event, because ATC has not eliminated alternative explanations for its failure to meet the projected growth rate, it is unnecessary for the Court to address that theory here.

### III. CONCLUSION

For the aforementioned reasons, this Court GRANTS Instron's motion for summary judgment, ECF No. 105.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE